Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3237 | **DATE** | 2/5/2003 |
| **CASE TITLE** | Susan G. Piano vs. Ameritech/SBC | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Defendant's motion to strike(32-1) is granted in part and denied in part. Summary judgment is granted as to all plaintiff's claims of age discrimination, and as to plaintiff's claim of gender discrimination in defendant's decision to release her from her temporary assignment. Summary judgment is denied as to plaintiff's claim of gender discrimination in defendant's decision not to hire her. Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | FEB 0 5 2003 | |
| | Notified counsel by telephone. | | date docketed | 43 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| SLB | courtroom deputy's initials | 03 FEB -5 PM 2:02 Date/time received in central Clerk's Office | date mailed notice  mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN G. PIANO, | ) | **DOCKETED** |
| Plaintiff, | ) ) ) | FEB 0 5 2003 |
| | ) | 02 C 3237 |
| v. | ) ) | Judge George W. Lindberg |
| AMERITECH/SBC, | ) ) | |
| Defendant. | ) ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Susan Piano's complaint alleges claims of discrimination based on age, under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; and sex, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. Before the court are defendant's Motion to Strike and Motion for Summary Judgment. For the reasons stated below, the Motion to Strike is granted in part and denied in part, and the Motion for Summary Judgment is granted in part and denied in part.

**I. Motion to Strike**

At the outset, the court must evaluate defendant's motion to strike portions of plaintiff's responses to defendant's Statement of Facts, portions of plaintiff's Statement of Additional Facts, and portions of affidavits filed in support of plaintiff's response and Statement of Additional Facts. The court first examines plaintiff's responses to defendant's Statement of Facts. Defendant argues that portions of plaintiff's denials of defendant's statements of fact in paragraphs 36, 78, 85, 96 improperly cite Plaintiff's Deposition Exhibit 9 or Dammer Deposition Exhibit 5 as support, since these exhibits are not admissible evidence. These exhibits are documents of Pro-Staff Temporary Services ("Pro-Staff"), which supplied temporary workers

43

(including plaintiff) to defendant. Plaintiff argues that they are admissible as admissions of the party-opponent's agent concerning a matter within the scope of the agency, under Federal Rule of Evidence 801(d)(2)(D). However, plaintiff offers no evidence supporting a finding that Pro-Staff was defendant's agent. Nor are these documents admissible under the business records exception of the hearsay rule, as plaintiff contends, since no foundation is laid for that exception. Accordingly, the portions of plaintiff's denials that rely on these exhibits are stricken.

In addition, plaintiff's denial of the portion of paragraph 51 that states that plaintiff refused to do assigned work is stricken, since plaintiff's denial does not address this charge. Plaintiff's denials in response to paragraphs 77 and 79 are stricken as non-responsive. Plaintiff's denial in response to paragraph 90, stating that defendant's citation does not support the statement, is stricken, as the citation does support the statement. Plaintiff's denial in response to paragraph 97 is stricken, as the affidavits cited in support of the denial do not demonstrate the respective affiants' basis for their knowledge. See Fed. R. Civ. P. 56(e) ("affidavits shall be made on personal knowledge").

The court next turns to defendant's motion to strike portions of plaintiff's Statement of Additional Facts. As with plaintiff's response to defendant's Statement of Facts, the following paragraphs that rely on Dammer Deposition Exhibit 5, which is inadmissible hearsay, are stricken: 9, 12, 13, 14, 20, 37, 40, 41, 42, 45, 46, and a portion of 15. For the same reason, paragraph 28, which improperly relies on Dammer Deposition Exhibit 10, is stricken.

Paragraph 47 states that plaintiff's fellow temporary worker, Michael Troc, wrote in the self-evaluation portion of his own Ameritech evaluation that he was hired by defendant in March 2001, and became a Team Lead on two accounts in July 2001. Plaintiff cites the performance

2

evaluation as support for this statement. The statement is offered as evidence that Troc became a Team Lead after he was hired as a permanent employee, to refute defendant's claim that it hired Troc because he had been a Team Lead. Defendant moves to strike the statement as inadmissible hearsay. Plaintiff responds that the evaluation is an Ameritech document, and as such is admissible as a party admission.

Federal Rule of Evidence 801(d)(2)(B) provides that "a statement of which the party has manifested an adoption or belief in its truth" is admissible against that party. According to the testimony of defendant's manager Vicki Dammer, an employee's supervisor first drafts certain sections of the performance evaluation. After Dammer reviews the supervisor's sections, the evaluation is given to the employee. The employee completes his or her portion, which is then reviewed by a manager. The statement at issue is a portion of Troc's description of how he achieved defendant's goal that he participate as a member of a diverse billing team. Both Troc's supervisor and Dammer signed the evaluation, without changing Troc's statement as to his hiring date and promotion date. Defendant's failure to make such a change to a statement of fact, when it would be expected to do so if the statement were inaccurate, indicates defendant's belief in the truth of the statement. Accordingly, Troc's statement is admissible as an admission of a party-opponent.

Finally, defendant moves to strike portions of three affidavits filed in support of plaintiff's response to defendant's Statement of Material Facts and plaintiff's Statement of Additional Facts. Paragraph 30 of Karla Kidd's affidavit is stricken, since there is no basis given for Kidd's personal knowledge underlying her statement that Chris Mirowski was not a Team Lead when he was hired as a permanent Ameritech employee. Defendant's motion to strike other

3

portions of plaintiff's response to defendant's Statement of Facts, other portions of plaintiff's Statement of Additional Facts, and portions of affidavits submitted by plaintiff is denied, because the denials or statements at issue are not material to the court's decision.

## II. Factual Background

The following facts are undisputed, unless otherwise noted. One of defendant Ameritech's related entities, SBC Global Markets, Managed Services and Custom Billing ("Custom Billing"), provides third-party billing services to institutional and corporate clients. Custom Billing's day-to-day services are provided by Billing Support Specialists. Billing Support Specialists are assigned to a team that typically serves a single client. Each team also has a Billing Support Specialist that is a "Team Lead." Team Leads are not management employees, but perform some higher-level functions on the team, such as assigning work to other Billing Support Specialists. In 2000, Custom Billing was subject to a hiring freeze, and used workers from temporary services agencies, including Pro-Staff Temporary Services, to work with permanent Ameritech employees to complete its work.

In late 1999, plaintiff, a woman, began working for Pro-Staff. At that time, plaintiff was fifty-one years old. Pro-Staff assigned plaintiff to work at Ameritech's Westchester office. Plaintiff was assigned to Custom Billing in late January 2000, as a Billing Support Specialist on the Dow Chemical account. She was reassigned to the General Motors account in February 2000. During the time relevant to this case, Vicki Dammer was a manager who supervised the Billing Support Specialists on the General Motors account and others.

4

Most of the temporary[1] workers in Custom Billing, including plaintiff, wanted permanent employment with Ameritech. Ameritech's practice was to hire temporary workers working as Billing Support Specialists as permanent Ameritech employees. In October 2000, Dammer held individual meetings with the billing specialists. According to plaintiff, when she met with Dammer, she told Dammer that she wanted a permanent position with Ameritech, and Dammer responded that plaintiff would be a permanent hire when the hiring freeze was lifted. Dammer does not recall plaintiff asking for a permanent position.

According to plaintiff, Dammer pursued relationships with the male billing specialists working under her, but not the female billing specialists. For example, Dammer frequented a bar downstairs from the office with the male billing specialists. Although plaintiff also contends that male billing specialist Michael Troc was credited with unworked overtime, she offers no admissible evidence in support of her contention.

In October 2000, plaintiff applied for a job with another Ameritech unit, Ameritech Advanced Data Systems, Inc. ("AADS"). The Senior Project Manager of AADS was required to receive budget approval before filling any position. In early 2001, plaintiff was informed that AADS wanted to hire her into the unit on a probationary basis. However, plaintiff's hire was contingent on either receiving budget approval (according to defendant) or the lifting of a hiring freeze in AADS (according to plaintiff).

Dammer secured a new temporary worker to replace plaintiff on the General Motors

---

[1] Plaintiff quibbles with defendant's use of the word "temporary" to describe employees who worked at Ameritech in non-permanent positions, because the assignments there, although not permanent, tended to be long-term. The court uses the word "temporary" to distinguish these workers from permanent Ameritech employees.

5

account. According to defendant, Dammer did so because she understood that it was a virtual certainty that plaintiff would be leaving Custom Billing in mid-January 2001. Plaintiff maintains that Dammer could not have reasonably believed that plaintiff's departure was certain and imminent, because Dammer knew that AADS was subject to a hiring freeze and that the lifting of a hiring freeze is not a certainty.

In early January 2001, AADS informed Dammer that AADS had not yet received budget approval for a position for plaintiff, and requested that plaintiff remain in Custom Billing for an additional one to two weeks. However, a temporary worker had already been secured to replace plaintiff on the General Motors account, and, according to defendant, the Custom Billing budget did not support another Billing Support Specialist on that account. Dammer's supervisor noted that Custom Billing had budgetary authority for a scanning assignment, and suggested that Dammer assign plaintiff to that project. Dammer did so. The scanning assignment required less skill than a billing specialist position, but plaintiff received the same hourly rate that she had been paid as a billing specialist.

During the month that followed plaintiff's assignment to the scanning project, Dammer and plaintiff each inquired several times as to the status of plaintiff's position with AADS. According to defendant, they were told that budgetary approval had not been granted; according to plaintiff, they were told that the hiring freeze remained in place.

On February 15, 2001, Dammer hired temporary employees Phillip Johnson, Chris Mirowski, Terry Archer, and Ayoob Meah into permanent positions. Meah, who had a computer programming background and had been working as a temporary data analyst, was hired as a data analyst. Johnson, Mirowski, and Archer were hired as permanent Billing Support Specialists.

6

According to defendant, Johnson, Mirowski, and Archer were hired primarily because they were Team Leads at the time they were hired. A month later, Michael Troc was hired into a permanent position. According to plaintiff, Ameritech's practice was to hire on the basis of seniority, rather than on the basis of Team Lead status.

On February 16, 2001, Dammer's supervisor advised her that Custom Billing's budget for plaintiff's scanning assignment had expired. Custom Billing did not have the budget for another Billing Support Specialist, and plaintiff's prior temporary position had been filled. Dammer informed Pro-Staff that she no longer had tasks for plaintiff to perform, and asked Pro-Staff to release plaintiff from the Custom Billing assignment. AADS did not receive budgetary approval to hire an entry-level probationary employee until April 10, 2001, at the earliest. AADS did not contact plaintiff about a position.

## II.  Discussion

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party bears the initial burden of demonstrating that no material issue exists for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the nonmoving party must offer specific facts demonstrating that a material dispute exists, and must present more than a scintilla of evidence to support its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

As an initial matter, the court must consider defendant's argument that plaintiff was not defendant's employee, and that therefore defendant could not be liable under the ADEA or Title VII for discharging her.[2] To maintain a cause of action for discriminatory discharge under either statute, a plaintiff must prove the existence of an employment relationship. Equal Employment Opportunity Comm'n v. North Knox Sch. Corp., 154 F.3d 744, 746-47 (7th Cir. 1998) (ADEA); Knight v. United Farm Bureau Mut. Ins. Co., 950 F.2d 377, 380 (7th Cir. 1991) (Title VII). Independent contractors are not protected by the ADEA or Title VII. Id. Since plaintiff was a Pro-Staff employee, the court must determine whether she can be considered to have been defendant's employee at the same time for the purpose of maintaining a discrimination case.

The question of whether a joint employer theory is applicable to discrimination cases is an unsettled one in this Circuit. See Alexander v. Rush N. Shore Med. Ctr., 101 F.3d 487, 493 n.2 (7th Cir. 1996) ("we continue to leave open the question that went unanswered in Shrock, 810 F.2d at 660 – i.e., whether an employee of employer $X$ may bring a Title VII action against employer $Y$ when $Y$ is not his employer, but merely someone whose discriminatory conduct interferes with his employment with employer $X$"). The Seventh Circuit has recognized joint employer status between a temporary services agency and its client in the labor law context, where "two employers 'exert significant control over the same employees.'" National Labor Relations Bd. v. Western Temp. Servs., Inc., 821 F.2d 1258, 1266 (7th Cir. 1987) (citations omitted). In discrimination cases in which the issue is merely whether an individual is an

---

[2] Although defendant's position apparently is that this argument should defeat all of plaintiff's claims, defendant certainly would be plaintiff's intended employer with respect to her claim that defendant discriminated against her by failing to hire her for a permanent, non-contract position. Therefore, the court discusses defendant's argument solely in the context of plaintiff's discriminatory discharge claim.

8

employee or an independent contractor, the Seventh Circuit similarly emphasizes the amount of control that the putative employer exercises over the individual. In such cases, courts must consider five factors, with the employer's right to control being the most important:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work place, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

Knight, 950 F.2d at 378-79.

This court concludes that the joint employer theory should apply in cases in which an individual is employed by a temporary employment agency, but suffers discrimination by the employer to which he or she is assigned, where that employer exerts a significant amount of control over the individual. Failure to apply the joint employer theory in this context would permit an employer that would otherwise be subject to Title VII's constraints to avoid liability for discrimination while maintaining total control over the work of its employees, merely by hiring them through agencies in a temporary capacity. Such a result would ill-serve the remedial purposes of the anti-discrimination statutes. Accordingly, the court examines the relationship between defendant and plaintiff using the five Knight factors, paying particular attention to the level of control factor.

Although Pro-Staff placed plaintiff in her assignment with defendant, recorded her absences, and counseled her (although apparently only on instructions from defendant), defendant appears to have had the sole responsibility for directing what work plaintiff performed and supervising her in how she performed it. In addition, defendant made the decision to change

9

plaintiff's assignment from working as a billing specialist to working on the scanning project, indicating additional control over plaintiff. The court concludes that defendant exerted substantial control over plaintiff's work. As to the other Knight factors, both Pro-Staff and defendant provided training. Plaintiff worked in defendant's facility. Although plaintiff was paid by Pro-Staff, defendant set (or at least approved) plaintiff's rate of pay. Finally, plaintiff's job was, by definition, temporary. The court cannot say that, as a matter of law, plaintiff was not defendant's employee under Title VII and the ADEA.

The court turns to plaintiff's discrimination claims. Plaintiff claims that defendant discriminated against her based on her gender and age, by failing to hire her for a permanent position, and by releasing her from her temporary position.[3] Plaintiff has presented no direct evidence of discrimination, and therefore the court uses the familiar McDonnell Douglas burden-shifting analysis. Under that analytical framework, to establish her discrimination claim based on failure to hire, plaintiff bears the burden of establishing a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she applied and was qualified for a position for which defendant was seeking applicants; (3) she was rejected for the position; and (4) defendant continued to seek applicants from individuals of plaintiff's qualifications for the position. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The analysis for plaintiff's unlawful discharge claim is similar; plaintiff must show that (1) she is a member of a

---

[3] In her Charge of Discrimination filed with the Illinois Department of Human Rights, which is incorporated in her complaint in this case, plaintiff also claimed that defendant discriminated against her by denying her a raise and denying her overtime. However, plaintiff's claim that she was denied a raise is barred, because she filed her discrimination charge over 300 days after she was denied the raise. See Hall v. Bodine Elec. Co., 276 F.3d 345, 352-53 (7th Cir. 2002). In addition, plaintiff now concedes that she worked as much overtime as she wanted, and did not feel that she was deprived of overtime.

10

protected class; (2) she was performing her job in a satisfactory manner; (3) she was subjected to an adverse employment action; and (4) that similarly situated employees were treated more favorably. See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644, 650 (7th Cir. 2001). If the plaintiff establishes a *prima facie* case of discrimination, the employer must then show a nondiscriminatory reason for the employment action. Peele v. Country Mut. Ins. Co., 288 F.3d 319, 326 (7th Cir. 2002). If the employer does so, the plaintiff must then present sufficient evidence to enable a trier of fact to find that the employer's explanation is pretextual. Id.

Defendant does not dispute that plaintiff is a member of a protected class, or that she was subjected to an adverse employment action when she was discharged from temporary employment, and not hired for permanent employment. Defendant contends that plaintiff fails to show that she was performing her job as a billing specialist satisfactorily, or that she was qualified to be hired for a permanent billing specialist position.[4] Plaintiff's only reference to the quality of her performance is that she never received complaints about her performance from Dammer until after plaintiff complained, late 2000, that Dammer favored male employees. Plaintiff's burden of proof at the *prima facie* stage is minimal, however, see St. Mary's Honor Ctr. v. Hicks, 509 U.S 502, 506 (1993), and the Seventh Circuit has long held that "the employer's acceptance of [an employee's] work without express reservation is sufficient to show

---

[4] It is not entirely clear whether plaintiff bases her failure to hire claim on defendant's denial of a permanent position in AADS or in Custom Billing. However, plaintiff has offered no evidence on the issue of whether a similarly situated individual was hired by AADS, and so any claim of failure to hire based on the denial of a permanent position in AADS would fail. Thus, the court focuses its analysis on plaintiff's inability to secure a permanent position in Custom Billing.

11

that the plaintiff was performing satisfactorily for the purpose of shifting the burden of proof." See Flowers v. Crouch-Walker Corp., 552 F.2d 1277, 1283 (7th Cir. 1977).

Defendant contends that plaintiff was not a team player, she refused to do assigned work on one occasion, rolled her eyes when asked to perform assignments, and at times behaved in a flippant and unprofessional manner. In addition, when plaintiff first started working for defendant, she commented to a co-worker that her Team Lead was a racist, a charge that defendant investigated and deemed baseless. Finally, according to defendant, in late 2000 or early 2001, plaintiff called a co-worker a "stupid naive white boy from the suburbs."

The court finds that defendant's complaints about plaintiff's performance are inadequate to show that plaintiff has failed to make a *prima facie* case. Plaintiff denies making the "stupid white boy" comment, and the court must resolve disputed facts in her favor. Although plaintiff admits making the remark that her Team Lead was a racist, this incident occurred approximately a year before defendant released her, and thus may not be representative of her performance at the time of her release. Defendant states that on one occasion plaintiff refused to do an assignment; however, defendant does not describe this incident or identify when it occurred. Therefore, even an admission of this fact would not show that plaintiff's performance was unsatisfactory when she was released. Defendant also states that plaintiff behaved in a flippant and unprofessional manner, that plaintiff frequently rolled her eyes at Dammer when she was given assignments, and that she was not a team player. Plaintiff responds that she never acted disrespectfully toward Dammer, or in an unprofessional manner. Although defendant seeks to strike this response on the basis that it is conclusory, it is no more so than defendant's statement to which it responds. A reasonable jury could conclude that the evidence at this stage of the

McDonnell Douglas analysis is sufficient to show that the plaintiff was performing satisfactorily when she was released, or that her conduct did not disqualify her from permanent hire, for the purpose of shifting the burden of proof.

The court next examines whether plaintiff has raised a genuine issue of material fact on the question of whether defendant treated similarly situated male or younger employees differently. As to plaintiff's claim of discriminatory discharge, she has offered no evidence that male or younger employees who had applied for other Ameritech positions were not released from their temporary positions. Moreover, although plaintiff claims that defendant hired thirteen temporary workers from Pro-Staff between February 2001 and May 2001, she offers no admissible evidence in support of her claim. Nor does she indicate the gender or age of the thirteen workers she alleges were hired. In addition, although plaintiff asserts in her response to one of defendant's statements of fact that the scanning project continued after plaintiff left, she cites as support only the statement of a former co-worker that a Laura Peters continued the scanning assignment, without any indication as to the co-worker's basis for personal knowledge of this information. In any event, Peters presumably is a woman, and plaintiff does not indicate her age. Therefore, plaintiff has failed to make a *prima facie* case on her discriminatory discharge claim.[5]

As to plaintiff's failure to hire claim, the evidence shows that four male temporary workers were given permanent positions the day before plaintiff was released from her temporary position. Plaintiff offers no admissible evidence as to the ages of these men. Defendant has

---

[5] The same failings in plaintiff's evidence also mean that she would not be able to show that defendant's claim that there was no budget to retain her was pretextual, even if she made a *prima facie* case.

13

offered evidence that one of the men had a computer programming background and was hired as a data analyst, and that the other three men were Team Leads. Plaintiff did not have a similar level of experience, and she offers no admissible evidence to call into question defendant's evidence as to the men's experience. Therefore, these four men were not similarly situated to plaintiff.

Plaintiff also offers evidence that defendant hired a fifth man, Michael Troc, into a permanent position, and that Troc was not a Team Lead. Defendant argues that Troc's hire should not be considered because it took place a month after plaintiff was released. However, plaintiff had informed defendant in October 2000 that she sought permanent employment, and she submitted a resume on the day she was released, which indicates that her interest in permanent employment did not end when she left. A trier of fact could determine that plaintiff had applied for the position that Troc was given, and that he was similarly situated to her. Plaintiff has stated a *prima facie* case of gender discrimination as to her failure to hire claim.

The burden shifts to defendant to show a nondiscriminatory reason for its failure to hire plaintiff into a permanent position. Defendant offers three reasons. First, defendant explains that it could not be expected to consider plaintiff for a permanent position because she did not submit a resume until February 16, 2001, the day she was released. In addition, defendant notes that plaintiff was never a Team Lead. Finally, defendant states that plaintiff had a negative attitude and performance problems as a temporary worker. The burden shifts to plaintiff to show that these reasons were a pretext for discrimination.

"A pretext, in employment law, is a 'phony reason' that the employer offers for engaging in discriminatory conduct...." Mills v. First Fed. Sav. & Loan Ass'n, 83 F.3d 833, 845 (7th Cir.

1996) (internal quotations omitted). A plaintiff can demonstrate an employer's proffered reason is pretextual: "(1) by showing that a discriminatory reason more likely than not motivated the employer"; or (2) "that the employer's proffered explanation is unworthy of credence." Kralman v. Illinois Dep't of Veterans' Affairs, 23 F.3d 150, 156 (7th Cir. 1994). The wisdom of the employer's decision is not at issue; rather, the genuineness of the employer's motives is what is significant. Testerman v. EDS Technical Prods. Corp., 98 F.3d 297, 304 (7th Cir. 1996).

Here, as to defendant's contention that it could not be expected to consider plaintiff for permanent employment because she did not apply soon enough, as noted above, plaintiff has offered evidence that she informed Dammer in October 2000 that she was seeking permanent employment. Moreover, plaintiff submitted her resume a month before Troc was hired, and there is no evidence that defendant would not have retained an applicant's resume for that relatively short period of time. In addition, plaintiff has offered evidence that, like her, Troc was not a Team Lead at the time of his hire. Troc later stated on an evaluation that he "was hired by SBC/Ameritech 3/01" and that he "became team lead on two accounts 7/01." Although this statement does not foreclose the possibility that Troc was a Team Lead when he was hired, at this stage the court is obligated to draw all reasonable inferences in plaintiff's favor. Finally, as discussed above in the context of plaintiff's *prima facie* case, there is a genuine issue of triable fact as to plaintiff's attitude and performance during her temporary assignment. Accordingly, defendant's motion for summary judgment is denied as to plaintiff's claim of gender discrimination in defendant's failure to hire her into a permanent position.

**ORDERED:** Defendant's Motion to Strike [32-1] is granted in part and denied in part. Defendant's Motion for Summary Judgment is granted in part and denied in part. The Motion

for Summary Judgment is granted as to all of plaintiff's claims of age discrimination, and as to plaintiff's claim of gender discrimination in defendant's decision to release her from her temporary assignment. The motion is denied as to plaintiff's claim of gender discrimination in defendant's decision not to hire her.

ENTER:

George W. Lindberg
Senior United States District Judge

DATED: FEB 0 5 2003